JOURNAL ENTRY AND OPINION
{¶ 1} Defendants-appellants, Allan O. Rosenfield, M.D. and Dr. Allan O. Rosenfield Inc., d/b/a Suburban Geriatrics ("Suburban Geriatrics"), appeal from a judgment entered upon a jury verdict against them, arguing that the court erred by denying their motions for a directed verdict and for a judgment notwithstanding the verdict ("judgment NOV"), and their motions for a new trial or, alternatively, remittitur. Plaintiffs-appellees, Alvin and Henrietta Turner, cross-appeal from the *Page 2 
court's denial of their motion for prejudgment interest. Although plaintiffs presented ample evidence that defendants breached the standard of care, the evidence that defendants proximately caused injury to plaintiffs and the evidence of damages caused by the defendants' malpractice was insufficient. Therefore, the court erred by denying the defendants' motions for a directed verdict and for judgment nothwithstanding the verdict. We reverse and remand with instructions to enter judgment for the defendants.
 Facts and Procedural History {¶ 2} Plaintiffs Alvin and Henrietta Turner filed their complaint against Dr. Rosenfield and Suburban Geriatrics as well as several other defendants on May 20, 2004. Their claims against the other co-defendants were dismissed before trial, without prejudice.
 {¶ 3} As relevant to this appeal, the complaint claimed that Mr. Turner received general medical care from Dr. Rosenfield between 1997 and 1999. The complaint claimed that Dr. Rosenfield failed to timely diagnose and treat Turner's prostate cancer. As a result of this failure, plaintiffs claimed the cancer progressed, causing Mr. Turner to lose the chance for survival and to suffer extensive and unnecessary medical treatment. Alternatively, Mr. Turner claimed that Rosenfield's negligence reduced his chance of survival from prostate cancer. Finally, Mrs. Turner claimed that she had lost consortium and companionship with her husband. *Page 3 
Rosenfield and Suburban answered separately, essentially denying the allegations of the complaint.
 {¶ 4} The case proceeded to a jury trial on June 5, 2006. In plaintiffs' casein-chief, the jury heard the testimony of both plaintiffs and their daugher, Monique Turner, plaintiffs' expert witnesses, Dr. Raymond Rozman, M.D. and Dr. Joseph Schmidt, M.D., and the defendant, Dr. Rosenfield.
 {¶ 5} Dr. Rozman is board-certified in internal medicine and gastroenterology. He described the two screening tests for prostate cancer, a digital rectal exam (DRE) and a prostate specific antigen (PSA) test. The DRE involves a physical examination of the portion of the prostate which can be felt through the rectum. The PSA test is a blood test for a compound produced by the prostate; this compound increases sharply if a prostate cancer develops, although an elevated PSA level does not necessarily mean that cancer is the cause. The side effects of some forms of treatment for prostate cancer — most important, incontinentence and/or impotence — lead some men to decline treatment.
 {¶ 6} Dr. Rozman testified that the standard of care requires a physician to discuss prostate cancer screening with men over age 50 and men who are at an increased risk of developing prostate cancer. He testified that Dr. Rosenfield deviated from the standard of care here by not discussing prostate cancer screening with Mr. Turner, and this deviation resulted in a delayed diagnosis of prostate cancer *Page 4 
to a time when the cancer was more advanced. He based this opinion on the lack of any record of a discussion about prostate cancer screening in Dr. Rosenfield's notes, although he agreed that the standard of care did not require a notation. He expressed no opinion whether Mr. Turner would have been cured if his cancer had been diagnosed earlier, stating that that matter would be within the expertise of a urologist or urologic oncologist.
 {¶ 7} Dr. Rozman reviewed Mr. Turner's course of treatment at the Veteran's Administration ("VA") after he left Dr. Rosenfield's care. A test conducted there on January 18, 2000 disclosed that Mr. Turner had a PSA level of 78.4; a second test conducted on January 25, 2000 showed a PSA level of 84.7. Normal PSA levels are 0-4. A nurse practitioner noted that the prostate was hard on examination. A bone scan and CT scan were then performed, neither of which showed any evidence of metastasis. Mr. Turner had surgery to obtain a lymph node dissection, but no lymph node tissue was retrieved, so this test was inconclusive.
 {¶ 8} Although the VA physicians did not testify at the trial, based on the course of hormone treatment Mr. Turner received, Dr. Rozman assumed that the VA physicians had presumed that the cancer had spread because of Mr. Turner's high PSA levels. Under this assumption of a presumption, neither removal of the prostate nor radiation treatment would have provided an opportunity to cure the cancer. With the hormone treatment, Mr. Turner's PSA levels dropped dramatically. However, *Page 5 
more recent blood tests showed that his PSA levels were rising, indicating that the cancer was becoming resistant to the hormone treatment. This meant that the cancer would continue to grow, and usually would metastasize to the lymph nodes then the bones.
 {¶ 9} Dr. Schmidt testified that he is board certified in urology. He teaches urology at the University of California San Diego School of Medicine and is an attending urologist at its medical center. He testified that the PSA test is very reliable in that the results are easily reproduced, but the interpretation of the results is difficult because a low PSA does not rule out a cancer diagnosis. The objective of the test is to lead to the diagnosis of tumors early enough that they are potentially curable.
 {¶ 10} Prostate cancer is actually diagnosed by a biopsy of the prostate. Prostate cancer is graded with a "Gleason score" of 2-10, assessing the relative aggressiveness of the cancer present. It is also staged according to how far the cancer has progressed.
 {¶ 11} Dr. Schmidt testified that Mr. Turner's PSA of 85 was "markedly abnormal, and in my experience is always associated with metastatic disease." Once the disease has metastasized, it is no longer curable, but it is treatable. According to Dr. Schmidt, Mr. Turner was offered a form of surgery, radiation, or hormone therapy. Surgery and radiation are potentially curative if the disease is *Page 6 
localized. Mr. Turner chose to receive hormone therapy, a medication which stops the production of male hormones thus stopping the growth of prostate cancers which tend to thrive on them. He initially responded well to this treatment, as most patients do, but his PSA levels began to increase in 2004, indicating that the cancer was becoming resistant to the hormone therapy, or "hormone refractory." Dr. Schmidt stated that Mr. Turner's prognosis was poor and that he would likely succumb to the metastatic disease, though it could be two years or more before his death.
 {¶ 12} Dr. Schmidt opined that Dr. Rosenfield had not complied with the standard of care because he did not offer PSA screening to Mr. Turner, or did not document the discussion. The rectal exams Dr. Rosenfield performed were not sufficient because "the PSA is by far the more accurate in detecting prostate cancer." He opined that the failure to offer screening led to a late diagnosis of metastatic prostate cancer with no possibility of cure. Had Dr. Rosenfield timely and appropriately screened Mr. Turner, more likely than not, his cancer would have been diagnosed at a stage where it was potentially curable. Without the chance for a potential cure, it is more likely than not that he will die from metastatic cancer.
 {¶ 13} Dr. Schmidt testified that Mr. Turner's cancer likely developed within four years before his diagnosis in early 2000. Had he been diagnosed between 1996 and 1998, it was more likely than not that his cancer would have been localized and he would have been "offered the choices of potentially curative treatment." *Page 7 
 {¶ 14} Dr. Rosenfield testified that he never ordered a PSA test for Mr. Turner. He did not recall whether he had discussed prostate cancer with Mr. Turner. He said he would order early prostate cancer testing if the patient wanted it, but he did not believe that early diagnosis of prostate cancer increased the likelihood of survival from it. He did not inform African-American patients that they were at an increased risk of developing prostate cancer because he was not convinced that race was really a marker for this disease. He did agree that men over the age of fifty had a higher risk of developing prostate cancer than men under the age of fifty.
 {¶ 15} Dr. Rosenfield testified that he does not recommend the PSA test as a screening device for prostate cancer, though he will order the test if the patient wants it. If symptoms suggest that a patient has prostate cancer, he will refer the patient to a urologist immediately; he does not order a PSA test as a diagnostic tool.
 {¶ 16} In his practice, Dr. Rosenfield usually discusses cancer screening in general with new patients, including prostate cancer screening; he does not chart routine practices such as these discussions. He agreed that he would have provided substandard care if he did not discuss the PSA test with Mr. Turner.
 {¶ 17} Mr. Turner testified that he was 70 years old at the time of trial. In addition to prostate cancer, he suffers from diabetes, for which he has been receiving treatment since 1989. His diabetes is controlled with diet, insulin and pills; *Page 8 
he has suffered no organ damage. He also had a mild heart attack in February 2000.
 {¶ 18} Mr. Turner testified that Dr. Rosenfield did not discuss prostate cancer or the PSA test with him. He said he would have remembered because that was an important part of his health. He said he had heard about PSA tests in the newspapers and on television, but the test was not offered to him until he went to the VA.
 {¶ 19} Mr. Turner testified that his first PSA tests at the VA showed a PSA level of 74. A second test was done, showing a PSA level of 85. A biopsy was then performed, resulting in a diagnosis of prostate cancer. He testified that he was told that surgery to remove the prostate was not an option because the cancer was too far advanced. He was given the option of either radiation or hormone shots, and chose hormone shots because he had seen people who received radiation treatment and it drained them. If he had been told radiation would have provided a cure, however, he would have done it.
 {¶ 20} At the close of the plaintiffs' case, defendants moved for a directed verdict. They argued first that there was no evidence that Dr. Rosenfield did not offer plaintiff a PSA test, second, that there was no evidence that plaintiffs were injured, and third, that there was no evidence that any negligence proximately caused any damage to Mr. Turner because he himself declined a treatment — *Page 9 
radiation — that was potentially curative. The court denied this motion. When defendants renewed their motion at the close of all the evidence, the court again denied it.
 {¶ 21} The jury returned a verdict for plaintiffs in the amount of $2,000,000. Defendants filed a motion for a judgment notwithstanding the verdict, for a new trial and/or for remittitur. Plaintiffs filed a motion for prejudgment interest. The court overruled defendants' motions. Defendants then filed the first of these two consolidated appeals. Thereafter, the court overruled plaintiffs' motion for prejudgment interest, and plaintiffs instituted the second of these consolidated appeals.
 Law and Analysis
I. Final Appealable Order.
 {¶ 22} Shortly after the first of these two consolidated appeals was filed, the defendants-appellants filed a "Suggestion of Lack of Final Appealable Order." This suggestion noted that the orders which appellants challenged might not be final and appealable as long as plaintiffs' motion for prejudgment interest remained unresolved, and pointed out that this question was pending in the Ohio Supreme Court. The Ohio Supreme Court subsequently concluded that a judgment awarding damages based upon a jury verdict is not final if a motion for prejudgment interest has been filed and remains pending. Miller v. FirstInternatl. Fid. Trust Bldg., *Page 10 113 Ohio St.3d 474, 2007-Ohio-2457, ¶ 11. Thus, the court's orders were not final and appealable when appellants filed their notice of appeal.
 {¶ 23} The trial court ruled on the motion for prejudgment interest on March 19, 2007. The plaintiffs filed a separate appeal from that ruling and asked that the two appeals be consolidated. This court granted that motion. While caution might have suggested that the defendants should have filed another notice of appeal after the ruling on prejudgment interest, under the circumstances, we will consider appellants' notice of appeal in Appeal No. 89441 as if it was filed immediately after the final entry denying the motion for prejudgment interest. See App.R. 4(C).
II. Denial of Directed Verdict and Judgment NOV.
 {¶ 24} Appellants' first assignment of error contends that the court erred by denying their motions for a directed verdict and for a judgment NOV. We review these rulings de novo, applying the same standard of review the trial court used. Kanjuka v. MetroHealth Med. Ctr.,151 Ohio App.3d 183, 2002-Ohio-6803, ¶ 14. A motion for a directed verdict or a motion for judgment notwithstanding the verdict may be granted if, viewing the evidence in the light most favorable to the non-moving party, reasonable minds can come to but one conclusion on a determinative issue, and that conclusion is adverse to the non-moving party. Id.
 {¶ 25} There was ample evidence in the record from which a reasonable jury could conclude that the standard of care required Dr. Rosenfield to discuss prostate *Page 11 
cancer screening, including the PSA test, with Mr. Turner. There is conflicting evidence in the record on the question whether Dr. Rosenfield complied with the standard of care by offering the PSA test to Mr. Turner; reasonable minds could conclude that he did not.
 {¶ 26} Dr. Schmidt testified that Mr. Turner's prostate cancer likely developed within four years before it was actually diagnosed in 2000, and if a PSA test had been conducted between 1996 and 1998, it would have shown the cancer while it was localized and thus presented the best opportunity for curative treatment. Dr. Rosenfield treated Mr. Turner between 1997 and 1999 within this window of opportunity.
 {¶ 27} There was conflicting evidence whether the cancer had metastasized or not at the time it was diagnosed in 2000. Both of plaintiffs' experts testified that Mr. Turner's extremely high PSA alone indicated that the cancer had metastasized; defendants' expert, Dr. John J. Petrus, disputed this conclusion. Viewed in the light most favorable to plaintiffs, however, a reasonable jury could have concluded that the cancer had metastasized, even though it was not perceptible through CT scans or bone scans.
 {¶ 28} There was expert testimony that localized cancers are potentially curable, while metastatic cancers are treatable but not curable. Thus, a reasonable *Page 12 
jury could conclude that Dr. Rosenfield's negligence deprived Mr. Turner of the opportunity for a potential cure.
 {¶ 29} Mr. Turner claimed that this lost opportunity deprived him of eight years of his life expectancy. This claim was based on (1) Dr. Schmidt's testimony that Mr. Turner would likely live another two years before he died of metastatic prostate cancer and (2) Dr. Rozman's testimony that a 70-year-old man (such as Mr. Turner at the time of trial) had a life expectancy of approximately ten additional years based on the statistical average life expectancy shown by United States government mortality tables. This argument assumes that Mr. Turner would have been cured if his cancer had been diagnosed while still localized. This assumption is not supported by the record. Cf. Davison v. Rini
(1996), 115 Ohio App.3d 688, 697 (discussing evidence in that case of plaintiff's reduced chance of survival because of delayed diagnosis).
 {¶ 30} At best, the testimony of Dr. Schmidt supports the proposition that earlier screening would have led to earlier diagnosis, at "a stage where he was potentially curable. [Emphasis added.]" Dr. Schmidt testified that "[h]ad the diagnosis been made between 1996 and 1998, more likely than not he would have had localized prostate cancer and been offered the choices of potential curative treatment. [Emphasis addded.]" Similarly, he said that Mr. Turner had "been denied the chance for early diagnosis with potential cure." There was no testimony from Dr. *Page 13 
Schmidt or any other expert witness that it was more likely than not that Mr. Turner would have been cured had the cancer been detected, diagnosed and treated earlier. Without such testimony, plaintiffs cannot show that Dr. Rosenfield's failure to offer Mr. Turner a PSA test between 1997 and 1999 reduced his life expectancy (as of the time of trial) from an average of ten years for persons his age to a predicted two years based on the course of his disease.
 {¶ 31} Without expert testimony that it was more likely than not that Mr. Turner would have been cured if the cancer was diagnosed sooner, plaintiffs cannot prove with reasonable probability that Dr. Rosenfield's failure to offer a PSA test proximately caused the claimed loss of life expectancy. The testimony about the lost "potential" for a cure may fit into the "loss of chance" theory of proximate causation approved by the Ohio Supreme Court in Roberts v. Ohio Permanente Med.Group, Inc., 76 Ohio St.3d 483, 1996-Ohio-375. Counsel for plaintiffs do not argue a loss of chance theory of proximate causation. Nevertheless, we analyze the case under this theory because the traditional proximate causation standard was not met.
 {¶ 32} In Roberts, the supreme court held that:
 "In order to maintain an action for the loss of a less-than-even chance of recovery or survival, the plaintiff must present expert medical testimony showing that the health care provider's negligent act or omission increased the risk of harm to the plaintiff. It then becomes a jury question as to whether the defendant's negligence was a cause of the plaintiff's injury or death. Once this burden is met, the trier of fact may then assess the degree to which the plaintiff's chances of recovery or survival have been decreased and calculate the appropriate measure *Page 14 
of damages. The plaintiff is not required to establish the lost chance of recovery or survival in an exact percentage in order for the matter to be submitted to the jury. Instead, the jury is to consider evidence of percentages of the lost chance in the assessment and apportionment of damages."
Roberts, 76 Ohio St.3d at 488.
 {¶ 33} Applying the "loss of chance" theory adopted inRoberts, there was evidence from which a reasonable jury could find that defendants proximately caused injury to Mr. Turner by depriving him of the possibility of a cure.
 {¶ 34} While Roberts does not require specific evidence of the percentage of chance lost in order to establish proximate cause, it does require such evidence to establish damages. The measure of damages adopted by Roberts requires that "damages are awarded in direct proportion to the chance of survival or recovery that the plaintiff lost." In other words, "the amount of damages recoverable by a plaintiff in a loss-of-chance case equals the total sum of damages for the underlying injury or death assessed from the date of the negligent act or omission multiplied by the percentage of the lost chance." Id. at 489.
 {¶ 35} Here, there is no evidence of the percentage of the chance lost by failing to diagnose Mr. Turner earlier. We know that he had no potential to be cured once the cancer had metastasized, but we do not know the likelihood of a cure if the cancer had been diagnosed when still localized. Thus, the question is, is there any evidentiary basis in this case for measuring this loss of potential? *Page 15 
 {¶ 36} The expert testimony that Mr. Turner's life expectancy was reduced from ten years to two cannot logically be equated to the loss of a potential for a cure. Plaintiffs' evidence of reduced life expectancy measures the difference between Mr. Turner's life expectancy with an incurable and now likely untreatable disease versus the average life expectancy of a person of his age. This is not an accurate measure of the damages caused by defendants, given that plaintiffs have not shown that Mr. Turner would have been cured but for the defendants' negligence.
 {¶ 37} There was evidence of Mr. Turner's loss of enjoyment of life and mental anguish because of his knowledge that he now has incurable prostate cancer. There was also evidence of he and his wife's loss of consortium. However, Roberts requires that the jury award damages in proportion to the percentage of chance lost. There was no statistical evidence of the percentage of chance lost. Therefore, there was no evidentiary basis upon which the jury could award damages.
 {¶ 38} Accordingly, we find that the trial court erred by failing to direct the verdict for the defendants or grant judgment notwithstanding the verdict in their favor. The expert evidence was insufficient to support a traditional proximate causation analysis, that but for defendants' negligence, Mr. Turner would have been cured. Even if plaintiffs had pursued a "loss of chance" theory of causation, they did not provide evidence of the percentage of chance lost for purposes of calculating damages. Therefore, the court should have directed the verdict for defendants. *Page 16 
III. Denial of Motion for a New Trial or Remittitur.
 {¶ 39} Our ruling on the first assignment of error renders the second assignment of error moot. App.R. 12(A)(1)(c).
IV. Denial of Motion for Pre-Judgment Interest.
 {¶ 40} Likewise, our ruling on the first assignment of error renders moot appellees' appeal from the trial court's order denying their motion for prejudgment interest.
 {¶ 41} Reversed and remanded with instructions to enter judgment for defendants.
It is ordered that appellants recover from appellees costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
COLLEEN CONWAY COONEY, P.J., CONCURS
PATRICIA ANN BLACKMON, J., DISSENTS
(SEE SEPARATE DISSENTING OPINION ATTACHED)