JOURNAL ENTRY AND OPINION
{¶ 1} The estate of Steffon Thomas, through its administratrix Monique Thomas, appeals from the judgment of the Cuyahoga County Court of Common Pleas which granted summary judgment to defendant-appellee, Dr. George Thompson, in a medical malpractice action. For the reasons stated below, we reverse.
 {¶ 2} In 1998, 15-year-old Steffon Thomas underwent elective surgery to correct a severe scoliosis condition. Dr. Thompson, along with other doctors, performed a complicated surgical procedure, known as an anterior and posterior spinal fusion with instrumentation placement, to correct Steffon's spine curvature. During the posterior surgical procedure performed by Dr. Thompson, the technician monitoring Steffon's spinal cord function alerted Dr. Thompson that one of the readings on the spinal cord function monitor had decreased. Dr. Thompson continued with the surgery and placement of the spinal hardware. Upon completion of the operation, Steffon was unable to move his legs. Despite subsequent removal of the spinal hardware and aggressive postoperative therapy, Steffon remained a paraplegic at the mid-thoracic level until his death two years later.
 {¶ 3} In December of 2001, the estate filed a negligence, medical malpractice, and wrongful death action against University Hospitals of Cleveland, Dr. George Thompson, Dr. Mark Goldfinger, Dr. David Dudgon, Dr. Vladimir Alexander, and Dr. Laurel Blakemore. The estate alleged that the *Page 4 
defendants negligently performed the spinal surgery and that the defendants' conduct deviated from the acceptable standard of care, amounting to medical malpractice. The estate further claimed that this malpractice proximately caused Steffon's paralysis and led to his subsequent death. The estate retained John Lonstein, M.D., an expert in orthopaedics and spinal surgery, as an expert witness to testify regarding the standard of medical care that Steffon received from the hospital and defendant doctors.
 {¶ 4} The estate voluntarily dismissed this action on December 31, 2003 and refiled the complaint against the same defendants on December 21, 2004. All defendants answered and then moved for summary judgment. On February 23, 2006, the trial court, citing plaintiff's failure to file an expert report, granted summary judgment to all defendants on all claims. Following the estate's motion for relief from judgment and the filing of Dr. Lonstein's expert report, the trial court reinstated the action as to the surgeons, Dr. Thompson and Dr. Blakemore, only.
 {¶ 5} After receipt of Dr. Lonstein's expert medical report, both doctors filed new motions for summary judgment. The trial court granted Dr. Blakemore's motion on October 19, 2006. The trial court initially denied Dr. Thompson's motion on February 6, 2007. However, after discovery and trial depositions were conducted, the court reconsidered its earlier ruling and granted Dr. Thompson's motion for summary judgment on September 14, 2007. *Page 5 
 {¶ 6} The estate timely appealed from this judgment, raising four assignments of error for review. All of the errors assigned relate solely to the granting of summary judgment to Dr. Thompson. The estate has not appealed any of the trial court's earlier decisions relating to the hospital or to the other doctors.
 I {¶ 7} The estate's first two assignments of error are interrelated. Therefore, we will consider them together on appeal.
 {¶ 8} "The trial court erred when it granted defendant's motion for summary judgment because plaintiff had sufficient medical evidence to present a jury question.
 {¶ 9} "The trial court erred when it granted appellee's motion for summary judgment for lack of competent credible expert testimony establishing proximate cause."
 {¶ 10} We review the granting of summary judgment under a de novo standard. We afford no deference to the trial court's decision, and independently review the record to determine whether summary judgment is appropriate.
 {¶ 11} Summary judgment is appropriate when, looking at the evidence as a whole: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) construing the evidence most strongly in favor of the nonmoving party, it appears that *Page 6 
reasonable minds could only conclude in favor of the moving party. Civ. R. 56(C); Horton v. Harwick Chem. Corp., 73 Ohio St.3d 679, 686-687,1995-Ohio-286. If any doubts exist, the issue must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg, 65 Ohio St.3d 356,358-59, 1992-Ohio-95.
 {¶ 12} A party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis of the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. Dresher v. Burt, 75 Ohio St.3d 280, 293, 1996-Ohio-107. If the moving party has satisfied this initial burden, the nonmoving party has a reciprocal burden under Civ. R. 56(E) to set forth facts showing that there is a genuine issue for trial. Id. at 293.
 {¶ 13} "The law imposes on physicians engaged in the practice of medicine a duty to employ that degree of skill, care and diligence that a physician or surgeon of the same medical specialty would employ in like circumstances. Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 130,75 O.O.2d 184, 186, 346 N.E.2d 673, 676. A negligent failure to discharge that duty constitutes `medical malpractice' if it proximately results in an injury to the patient. Whether negligence exists is determined by the relevant standard of conduct for the physician. That standard is proved through expert testimony. Id. at 131-132, 75 O.O.2d at 186-187,346 N.E.2d at 677." Berdyck v. Shinde, 66 Ohio St.3d 573, 579,1993-Ohio-183. *Page 7 
 {¶ 14} Dr. Thompson moved for summary judgment on the grounds that the estate failed to show that any alleged action or inaction on his part proximately caused harm to Steffon. He argues that because the estate's expert could not state to a degree of medical certainty exactly what caused the injury to Steffon's spinal cord, the estate could not prove an essential element of its medical malpractice claim and he was entitled to judgment as a matter of law. We disagree.
 {¶ 15} In his discovery deposition, Dr. Lonstein testified that in spinal procedures such as the one Steffon underwent, the surgeons monitor somatosensory evoked potential ("SSEP"). To do so, electrodes are placed on peripheral nerves in the patient's legs and arms and receiving electrodes in the scalp. The monitoring machine sends a small current through the electrodes which is received by the brain. The machine then monitors the return signals or "tracings." The amplitude, or strength of the signal, and the latency, or time between the signal and the response, are both recorded. He explained that he views the SSEP monitoring as providing an early warning sign of possible change in spinal cord function.
 {¶ 16} Dr. Lonstein reviewed the logs of Steffon's surgery and the SSEP monitoring of that surgery. He stated that the SSEP monitoring log shows that during the anterior procedure the evoked potentials were normal. However, during the posterior spinal surgery performed by Dr. Thompson, the log shows *Page 8 
the amplitude of the SSEP signals decreased. According to Dr. Lonstein's deposition testimony, the log shows that the decrease was noted at 5:05 p.m., 19 minutes after the first screws were inserted. Dr. Thompson was alerted one minute later. The surgery continued and at 5:22 p.m., Dr. Thompson inquired whether the SSEP signals had improved and he was informed they had not. He continued with the placement of spinal hardware. Hooks and screws were placed on both sides of the spine, and then rods were inserted. The left rod was inserted at 5:42 p.m. Dr. Thompson again inquired about the SSEP signals at 6:07 p.m. and was told they showed the same decreased amplitude. The right rod was then inserted at approximately 6:10 p.m. Closing began at 6:35 p.m. After closing, at 8:02 p.m., the SSEP signals were even lower. Upon awakening at 8:07 p.m., Steffon was unable to move his legs. At 8:11 p.m., the technician was unable to record reliable signals. Steffon was returned to surgery six hours later and all the spinal instrumentation was removed and steroid therapy commenced, however, there was no recovery of function.
 {¶ 17} Dr. Lonstein stated in his expert report that the acceptable standard of care in spinal procedures where the SSEP signals experience a decline, is to stop the procedure and perform a "wake-up test." He stated that a change in the SSEP signals signifies that something is wrong with the functioning of the spine and that a wake-up test, in which the patient is awakened and asked to move his toes, is standard practice in these types of cases. If the patient can move his *Page 9 
toes, the surgery can continue. If the patient cannot move his toes, the surgery should be terminated and corrective measures taken.
 {¶ 18} Dr. Lonstein offered his expert opinion that Dr. Thompson's failure to stop the procedure and perform the wake-up test immediately after being alerted by the technician monitoring the SSEP signals that a change had occurred, did not meet the acceptable standard of care for the kind of surgery performed on Steffon.
 {¶ 19} He further opined that Dr. Thompson's failure to stop the surgery and perform the wake-up test increased the risk of permanent paralysis by delaying the start of treatment which might have allowed Steffon to recover from the paralysis. Dr. Lonstein stated in his expert report:
 {¶ 20} "It is my opinion that immediately upon learning of these decreased somatosensory evoked potentials the patient's surgeon should have stopped surgery, performed a wake-up test, and if this showed no function promptly implemented corrective measures such as steroid therapy and not continued with the surgery. Had the surgeons taken these steps this would have probably increased the patient's chance of recovery."
 {¶ 21} Dr. Lonstein explained, "studies have shown and case reports have shown that if surgery is stopped and you do not proceed, the chance of recovery, especially in the immediate stage, is greater." *Page 10 
 {¶ 22} In reviewing a motion for summary judgment, pursuant to Civ. R. 56(C), we must consider the inferences to be drawn from the underlying facts contained in affidavits and other exhibits in the light most favorable to the nonmoving party. Hounshell v. American State Ins.Co. (1981), 67 Ohio St.2d 427, 433. Accordingly, because Dr. Lonstein stated his opinion as to the standard of care exercised by Dr. Thompson in terms of medical probability and because Dr. Lonstein directly tied Dr. Thompson's failure to adhere to that standard to Steffon's failure to recover motor function in his legs, appellant produced sufficient evidence to overcome Dr. Thompson's motion for summary judgment. Accordingly, we sustain appellant's first two assignments of error and reverse the trial court's granting of summary judgment.
 II {¶ 23} The estate's third assignment of error is:
 {¶ 24} "The trial court erred in failing to recognize appellant's valid loss-of-chance' claim."
 {¶ 25} The estate argues that a claim for "loss-of-chance of recovery" is a part of its medical malpractice and wrongful death action and that Dr. Lonstein's testimony was sufficient to raise an issue of material fact for the jury on this claim.
 {¶ 26} Before reaching the merits of the estate's argument, we must first address a matter of procedure. Appellee argues that because the trial court *Page 11 
denied the estate's motion to amend the complaint to add a separate cause of action sounding in loss-of-chance of recovery, that claim was not properly before the trial court. We disagree.
 {¶ 27} In Roberts v. Ohio Permanente Med. Group, Inc.,76 Ohio St.3d 483, 1996-Ohio-375, the landmark case relating to the loss-of-chance theory, the plaintiff did not separately plead a "loss-of-chance" cause of action in the complaint. The complaint stated only a claim for wrongful death. Additionally, courts in this state and other states have specifically found that a claim for "lost chance of survival" need not be raised separately from a wrongful death or medical malpractice claim. See Heath v. Teich, Franklin App. No. 03AP-1100, 2004-Ohio-3389, citing appellate decisions out of Iowa and Michigan courts. In the instant case, the estate's expert witness raised the loss-of-chance theory in both his expert report and his depositions. The trial court recognized the loss-of-chance claim as the underlying basis for the estate's suit. Accordingly, we find the matter was properly before the trial court and we will review the merits of the estate's assignment of error relating to this argument.
 {¶ 28} Prior to the decision in Roberts, the Ohio Supreme Court had specifically rejected the loss-of-chance theory of recovery. SeeCooper v. Sisters of Charity of Cincinnati, Inc. (1971),27 Ohio St.2d 242. In Roberts, the court overruled its earlier holding, stating, "we recognize the loss-of-chance theory and *Page 12 
follow the approach set forth in Section 323, Restatement of Torts."76 Ohio St.3d at 488. That provision of the Restatement provides:
 {¶ 29} "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
 {¶ 30} "(a) his failure to exercise such care increases the risk of such harm ***." 2 Restatement of the Law 2d, Torts (1965), Section 323.
 {¶ 31} The Roberts court noted that, "[m]ost of the courts that apply Section 323 hold that once the plaintiff proves that the defendant has increased the risk of harm by depriving the patient of a chance to recover, the case can go to the jury on the issue of causation regardless of whether the plaintiff could prove to a degree of medical probability that the defendant caused the patient's injury or death. See, e.g., Hamil v. Bashline (1978), 481 Pa. 256, 273, 392 A.2d 1280,1288; Herskovits v. Group Health Coop. of Puget Sound (1983),99 Wash. 2d 609, 664 P.2d 474. Although the plaintiff still has the burden of persuading the jury by a preponderance of the evidence that defendant brought about the harm plaintiff has suffered, the jury, rather than the medical expert, is given the task of balancing probabilities.Hamil, 481 Pa. at 273, 392 A.2d at 1288." Roberts, 76 Ohio St.3d at 486. *Page 13 
 {¶ 32} As a result of Roberts, the traditional standard of medical malpractice does not apply to loss-of-chance claims. Instead, a plaintiff asserting a loss-of-chance claim "must present expert medical testimony showing that the health care provider's negligent act or omission increased the risk of harm to the plaintiff. It then becomes a jury question as to whether the defendant's negligence was a cause of the plaintiff's injury or death." Roberts, 76 Ohio St.3d at paragraph one of the syllabus.
 {¶ 33} The estate presented expert medical testimony that Dr. Thompson's decision to continue the surgery without performing a wake-up test, despite the fact that the decedent's SSEP signals had decreased, fell below the standard of care for physicians performing this kind of surgery. The decline in SSEP signals indicated that all was not well with regard to Steffon's condition. Instead of stopping the surgery and performing a wake-up test to assess the patient for paralysis, Dr. Thompson continued the operation, ultimately delaying treatment for Steffon's condition. Applying the reasoning of the supreme court in theRoberts decision, and viewing the evidence in a light most favorable to the estate, we find there remains a triable issue of fact as to whether Dr. Thompson increased the risk of harm to Steffon by delaying treatment that might have inured to his benefit and thereby depriving him of the possibility of recovery. Although the estate's medical expert did not state a specific percentage relating to this lost chance of recovery,Roberts does not require specific evidence of the *Page 14 
percentage of chance lost in order to establish proximate cause, only to establish the amount of damages. Turner v. Rosenfield, Cuyahoga App. Nos. 89441 89719, 2008-Ohio-1932.
 {¶ 34} Therefore, for the reasons stated above, appellant's third assignment of error is sustained.
 III {¶ 35} The estate's fourth assignment of error is:
 {¶ 36} "The trial court erred when it granted defendant's motion for summary judgment because the plaintiff raised a valid res ipsa loquitur question of fact and is entitled to a jury instruction based upon this doctrine."
 {¶ 37} It is a well established principle of law in Ohio that a party cannot raise new issues for the first time on appeal. See In reM.D. (1988), 38 Ohio St.3d 149, 151. Ordinarily, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed. Additionally, appellate courts do not have to consider an error which the complaining party could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. State ex rel. QuartoMining Co. v. Foreman, 79 Ohio St.3d 78, 1997-Ohio-71.
 {¶ 38} Because the estate failed to raise an issue of res ipsa loquitur before the trial court, the estate is deemed to have waived this argument. Appellant's final assignment of error is overruled. *Page 15 
 {¶ 39} Judgment reversed and case remanded for further proceedings consistent with this opinion.
It is ordered that appellant recover of appellee her costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 SEAN C. GALLAGHER, P.J., and PATRICIA ANN BLACKMON, J., CONCUR
 *Page 1